FIFTH DIVISION  

November 3, 2000

No. 1-99-0519

TAYLOR SUSNIS, a Minor, by Brian Susnis and Jami Susnis, Her Parents and Next Friends, and BRIAN AND JAMI SUSNIS, Indiv.,

Plaintiffs-Appellants,

v.

BAROUKH RADFAR, BAROUKH RADFAR, M.D., S.C., a Corporation, JEFFREY LIN, PRONGER SMITH MEDICAL ASSOCIATES, a Partnership, MARK JUNDANIAN, BLUE ISLAND RADIOLOGY CONSULTANTS, S.C., a Corporation, ST. FRANCIS HOSPITAL AND HEALTH CENTER, a Corporation,

Defendants-Appellees. 

)

)

)

)

)

)

)

)

)

)

)

)

)

)

)

)

)

)

Appeal from the

Circuit Court of

Cook County

Honorable James S. Quinlan, Jr.,

Judge Presiding.

PRESIDING JUSTICE QUINN delivered the opinion of the court:

This appeal concerns a medical malpractice action brought on  behalf of plaintiff, Taylor Susnis, a minor, by her parents, plaintiffs, Brian and Jami Susnis.  Plaintiffs sought recovery for injuries Taylor allegedly sustained days after her birth due to the negligence of defendants.  Taylor suffered from cardiorespiratory arrest due to a congenital heart condition and during resuscitation, 
an interosseous line was inserted that subsequently resulted in damage to the growth plate in her left leg.  

At the close of plaintiffs' case, the trial court granted a directed verdict in favor of defendants Dr. Mark Jundanian and Blue Island Radiology Associates (Blue Island).  At the conclusion of the trial, the jury rendered a verdict in favor of defendants Dr. Jeffrey Lin and Pronger-Smith Medical Associates (Pronger-Smith). The trial court entered an order of mistrial as to defendants Dr. Baroukh Radfar and St. Francis Hospital and Health Center (St. Francis) when the jury was unable to arrive at a verdict.  On appeal, plaintiffs contend that: (1) the trial court erred in granting a directed verdict for Dr. Jundanian and Blue Island on the issue of proximate cause where plaintiffs produced sufficient evidence that Dr. Jundanian breached the standard of care; and (2) pursuant to Supreme Court Rule 213 (177 Ill. 2d R. 213), the trial court erred in barring plaintiffs' expert from testifying that the actions of Dr. Lin and Pronger-Smith caused or contributed to Taylor's injuries.  For the reasons that follow, we affirm.

The following facts were adduced at trial.  Taylor Susnis was born on August 22, 1992, at St. Francis.  On August 23, 1992, Dr. Radfar, a pediatrician on staff at St. Francis, examined Taylor and found her to be a normal newborn.  
On August 24, 1992, at approximately 6:30 a.m., a nurse observed that Taylor's heart rate was rapid, her lips were blue, and she was hypoactive or unresponsive when moved.  The nurse moved Taylor to a special care nursery for further observation and contacted Dr. Radfar at approximately 7:30 a.m. to inform him of her condition.  Based on Taylor's condition, Dr. Radfar ordered several tests, including an electrocardiogram (EKG), which is used to evaluate heart rate and rhythm, and a chest X ray.  A nurse contacted Dr. Radfar again at approximately 1 p.m. on August 24, 1992, and informed him that Taylor was stable and active and that she was not having any more problems.  Dr. Radfar testified that after he examined Taylor at approximately 6:30 p.m. the same day, he evaluated her chest X ray and found it be normal.  
Dr. Radfar also testified that he customarily relied on the expertise of radiologists to interpret X rays and that he relied on the expertise of Dr. Jundanian in this case to interpret Taylor's chest X ray.

Dr. Radfar stated that Taylor's condition on August 24, 1992, was due to fluid in the lungs, which is a normal and temporary condition in a newborn, and was not due to cardiac problems.  However, Dr. Radfar testified in an earlier deposition that Taylor did not have fluid in her lungs.  The record indicates that this condition was not mentioned in Taylor's medical charts.  Dr. Radfar also admitted that he did not order an echocardiogram, which is the definitive test for diagnosing cardiac problems.  Dr. Radfar indicated that, in his opinion, the echocardiogram was unnecessary because Taylor did not have any persistent problems.  Dr. Radfar further testified that he did not order a consultation with a pediatric cardiologist for the same reason.  
In 1992, the standard of care would have required a pediatric consult if the doctor saw a cardiac anomaly or an enlarged heart.

Dr. Jundanian testified that he
 read Taylor's chest X ray on August 24, 1992, but did not recall if he actually spoke with Dr. Radfar about her condition.  Dr. Jundanian stated in his report that Taylor's pulmonary vascularity was slightly prominent, which, among other things, could have been a cardiac abnormality.  Dr. Jundanian further testified that he thought Taylor's heart size was within normal limits and not enlarged.  However, Dr. Jundanian also testified that if Dr. Radfar had called and asked whether Taylor's chest X ray was normal or abnormal he would have told him that it was abnormal.

On August 25, 1992, Dr. Radfar examined Taylor again prior to her discharge from the hospital.  Dr. Radfar testified that his examination indicated that she was doing well, her heart was beating with a regular rhythm, and she had no fluid in her lungs.  Taylor was discharged from St. Francis on August 25, 1992, and Dr. Radfar 
arranged to see her two days later to ensure that she continued to do well.  
 

 On August 26, 1992, Jami Susnis brought Taylor to Dr. Jeffrey Lin's office for a checkup.  Jami Susnis informed Dr. Lin of Taylor's problems at the hospital.  After a complete examination, Dr. Lin determined that Taylor was doing well; she was alert and active, her skin color was normal and her heart sounds were regular.  Dr. Lin also discovered that a chest X ray had been taken but did not order or examine the X-ray charts.  Although  Dr. Lin contacted St. Francis and noted that Taylor's chest X ray stated that there was "increased lung marking," he did not order a second chest X ray.  

On August 28, 1992, Dr. Lin examined Taylor again because she had gained more weight than average for a newborn of her age.  Dr. Lin testified that the baby appeared normal at the exam and he arranged for another checkup a week later.  

On August 30, 1992, Jami Susnis observed "white  stuff" coming out of Taylor's mouth and nose.  Jami Susnis attempted to clear Taylor's nose and mouth, but when she remained congested, Jamie Susnis contacted Dr. Lin's office.  Another doctor at the office advised that Taylor was probably suffering from a cold.  However, when Taylor seemed to worsen, Jami Susnis took her to the emergency room at St. Francis.  

Taylor suffered a cardiorespiratory arrest in the St. Francis emergency room.  Taylor was resuscitated and then transferred to Christ Hospital.  In order to save her life, the doctors at Christ Hospital inserted an interosseous line in her leg to resuscitate her.  
An interosseous line is a form of emergency vascular access to insert fluids or other medications in cases where a patient's peripheral veins are not easily accessible.  A special needle is manually drilled into the hollow center of the bone and then fluid is pumped directly into the center of the bone.
 

Taylor was treated for multi-organ failure, and on September 18, 1992, she underwent heart surgery to treat an interrupted aortic arch.  Although Taylor's heart problems were resolved, she suffered severe damage to the growth plate in her left leg, apparently as a result of the interosseus line.  

Dr. Mark Moran testified that he first saw Taylor on March 3, 1997.  By this time, Taylor had undergone at least two unsuccessful surgeries in an attempt to repair the damage to the growth plate in her left leg.  Dr. Moran observed that Taylor's condition began with partial growth arrest of her tibia and by the time he treated her, the entire proximal tibia had stopped growing.  Dr. Moran testified that X rays performed early on in her treatment indicated that the growth plate appeared normal for a child of Taylor's age.  However, Dr. Moran further testified that, as Taylor gets older, there will be a leg length discrepancy with the
 
left leg becoming progressively shorter than the right. 

Brian and Jami Susnis filed a complaint on Taylor's behalf and individually and alleged that Dr. Radfar, Dr. Lin and Dr. Jundanian each failed to observe abnormal cardiac and pulmonary vascular findings in Taylor's chest X ray.  Plaintiffs also sued Pronger-

Smith, a multispecialty practice group to which Dr. Lin belongs, and Blue Island, Dr. Jundanian's practice group.  While these entities are parties to this appeal, plaintiffs allege only that the doctors are agents of these entities and they make no claims that the entities were independently negligent.  Count II of the complaint alleged that St. Francis failed to timely and adequately triage Taylor upon her arrival to the emergency room.

Prior to trial, several motions 
in
 
limine
 were filed, including a motion to limit any testimony regarding Dr. Lin's deviations from the standard of care unsupported by testimony or evidence of causation which the trial court granted.   The court also granted Dr. Lin's motion 
in
 
limine
 barring plaintiffs' opinion witnesses from offering any opinions not previously expressed in depositions or Rule 213 interrogatories.  Dr. Jundanian adopted Dr. Lin's motions as they applied to him.  The court also granted Dr.  Radfar's motion 
in
 
limine
 barring plaintiffs' experts from testifying as to causation not previously testified to in discovery.

During trial, 
Dr. Marilyn Siegel, one of plaintiffs' experts, testified that, in her opinion, Dr. Jundanian did not meet the standard of care.  Dr. Siegel opined that Dr. Jundanian should have known from the chest X ray that Taylor's heart was enlarged. 

Dr. Robert Lerer provided expert testimony that, in his opinion, Dr. Radfar and Dr. Lin deviated from the standard of care by not requesting a cardiology consult for Taylor based upon the signs and symptoms she exhibited after delivery.  In Dr. Lerer's opinion, Taylor's chest X ray was abnormal and her heart was enlarged.  Dr. Lerer testified that, based upon these signs, an echocardiogram should have been ordered or a cardiology consult should have occurred.  As to Dr. Lin specifically, Dr. Lerer testified that he deviated from the standard of care by failing to obtain all of Taylor's medical records on August 26, 1992, and on August 28, 1992.  Dr. Lerer added that Dr. Lin deviated from the standard of care by not examining Taylor's femoral pulses on August 26, 1992, and August 18, 1992.  However, on cross-examination, Dr. Lerer testified that there was nothing in the physical examination that would have suggested heart disease to a reasonably well-

qualified pediatrician and that it was unreasonable to have expected Dr. Lin to have had Taylor's hospital records by the first time he examined her on August 26, 1992.  

Plaintiffs' interrogatories and supplemental interrogatories dated November 5, 1998, named Dr. David C. Schwartz as a witness who would provide testimony that Taylor suffered injury as a result of the interosseous line placed in her leg.  In plaintiffs' answers to Rule 213 interrogatories, plaintiffs stated that Dr. Schwartz would render the following opinions: (1) based upon Taylor's symptoms, the EKG and the chest X ray, Taylor should have been examined by a pediatric cardiologist; and (2) if a pediatric cardiologist had examined Taylor, an echocardiogram would have been ordered which would have shown the congenital heart condition. 

At Dr. Schwartz's deposition, the following testimony was elicited:

"Q. Do you have any opinions in this case

regarding the cause of the left tibial growth arrest for Taylor Susnis in her left leg?

A. No.

Q. Have you reviewed any records pertaining to

the left tibial growth arrest?

A. No. 

Q. When Taylor Susnis was first examined by

Dr. Radfar, was it appropriate for Dr. Radfar to order an EKG and x-ray?

***

A. I don't think so, because I believe that

exam was the  – the day of birth, or at least within 24 hours.  And my impression, from the medical record, was that at that point the baby was fine.  There were no symptoms being recorded by the nurses.  And his evaluation presumably was that the baby was normal.

My impression is that that EKG, more

likely than not, is
 
 abnormal, and maybe even 90 percent likely to be abnormal.  In that setting, I would not say 'possible.'  I would say maybe probable, and maybe even stronger than that.

Q.  So you believe that the EKG that was

performed on Taylor Susnis and read in the hospital when she was two days old was actually an abnormal EKG?

A.  Yes.  

Q.  Do you have an opinion as to whether or not Dr. 

Radfar deviated from the standard of care in this case?

A.  Yes.

Q.  And what is your opinion?

A.  My opinion is that he did deviate by not

recognizing, based on the nurse's description of this infant in the nursery and the questionable EKG interpretation and the x-ray interpretation which also included abnormality in the pulmonary vascular pattern.

If you didn't put all that together and come

to the conclusion that the baby could possibly have a heart defect, and, therefore, request a cardiology consult, considering that in his deposition he says he gets a hundred cardiology consults a year – I mean, that's almost unbelievable.  If that's true, I can't imagine what his tolerance is for getting a cardiac consult."

At trial, plaintiffs' counsel attempted to ask Dr. Schwartz the following question: 

"Q. Doctor, based on everything we've gone

over, is it your opinion again that the deviations from Dr. Radfar, deviations from standard of care, to a reasonable degree of certainty caused or contributed to the cardiac arrest?

A.  Yes.

Q. Is it your opinion to –

[Defendant's Counsel:]  Objection, your Honor, on 

Rule 213."  

Defendants' counsel objected on the grounds that this question was not in the answers
 to the Rule 213 interrogatories or in the deposition.  
Defendants' counsel argued that the deposition testimony failed to elicit whether Dr. Schwartz had an opinion that these deviations caused the cardiac arrest; therefore, this question could not be asked at trial.  Plaintiff's counsel argued that although that specific question was not asked of Dr. Schwartz during the deposition, he was asked a series of questions which elicited the same information - that Dr. Radfar's deviations from the standard care caused or contributed to Taylor's cardiac arrest.  

The court ruled that Dr. Schwartz's answers in the deposition and Rule 213 interrogatories did not suggest that Dr. Radfar's alleged deviations proximately caused the cardiac arrest.  Therefore, the judge prohibited counsel from asking that specific question during trial.  The trial judge specifically stated the following: "Now, if you want to ask questions that were asked and answered in discovery that you feel cover that issue but in different words, I'll allow you to do that if they're in discovery."  After this ruling, plaintiffs' counsel asked the following: 

"Q.  Had Dr. Radfar met the standard of care,

how would the cardiac arrest have been avoided? 

By the appropriate treatment of the congenital

heart defect. 

Q.   Had Dr. Lin met the standard of care, how would the cardiac arrest have been avoided?

A.   Same thing, by appropriate treatment of

the cardiac defect.

* * * 

Q.   And to a reasonable degree of medical

certainty, had Dr. Radfar met the standard of care, would this multi-organ damage failure have been avoided?   

A.  Yes.

Q.  The same way with Dr. Lin.  Had Dr. Lin to

a reasonable degree of medical certainty met the standard of care, would the multi-organ damage have been avoided?

A.  Yes.  

* * *

Q.  Had Dr. Radfar and Dr. Lin to a reasonable

degree of medical certainty met the standard of care, would the heart failure have been avoided? 

A.  Yes."  

On cross-examination, Dr. Schwartz was impeached with his deposition testimony wherein he had testified that Dr. Lin had acted within the standard of care on both August 26 and August 28.

At the close of plaintiffs' case, several defendants filed motions for directed verdicts.  Dr. Jundanian and Blue Island argued in their motion for directed verdict that plaintiffs failed to establish by expert testimony that Dr. Jundanian deviated from the standard of care and that plaintiffs failed to link Dr. Jundanian's alleged negligence to Taylor's injury. 

The trial court granted a directed verdict in favor of Dr. Jundanian and Blue Island and dismissed the case against them with prejudice on December 10, 1998.  The court found that plaintiffs failed to establish that the negligence of Dr. Jundanian was the cause of any injuries Taylor suffered.  Plaintiffs filed a post-

trial motion on December 16, 1998. 

Dr. Jan Ellen Berger, a pediatrician, testified on behalf of Dr. Lin.  Dr. Berger reviewed Taylor's medical record, Dr. Lin's office notes, the emergency department record at St. Francis and the depositions of all parties and witnesses.  Based on this review, Dr. Berger testified that Dr. Lin was not required to obtain Taylor's medical records by August 26 or August 28 or to refer her to a pediatric cardiologist.  Dr. Berger testified that based on the two exams conducted by Dr. Lin, Taylor's condition was normal and stable.  In Dr. Berger's opinion, Dr. Lin performed within the standard of care.  

At the conclusion of trial, the jury was instructed that plaintiffs claimed that Taylor was injured and that Dr. Lin was negligent in: (1) failing to order an echocardiogram or obtaining a cardiac consultation; and (2) failing to observe symptoms of a congenital heart condition.

The jury returned a verdict in favor of Dr. Lin and Pronger-

Smith on December 21, 1998.  Plaintiffs filed a posttrial motion on January 6, 1999, and argued that the verdict was against the manifest weight of the evidence.  Plaintiffs' posttrial motion further argued that the trial court erred in barring plaintiffs' expert, Dr. Schwartz, from testifying that the acts and omissions of Dr. Lin caused or contributed to the multi-organ damage and cardiac arrest Taylor suffered.  The court subsequently denied plaintiffs' posttrial motions and this timely appeal followed.

Plaintiffs first contend that the trial court erred in granting a directed verdict for Dr. Jundanian and Blue Island.  We first note that the parties are in disagreement concerning the applicable standard of review for directed verdicts.  Plaintiffs argue that the proper standard of review is 
de
 
novo
.  Defendants assert that we review a judgment for directed verdict under an abuse of discretion standard.  

We hold that review of a grant of a directed verdict is 
de
 
novo
.  
City of Mattoon v. Mentzer
, 282 Ill. App. 3d 628, 633, 668 N.E.2d 601 (1996).  While we recognize that there is authority to the contrary in Illinois (
Boatmen's Bank v. Dowell
, 208 Ill. App. 3d 994, 1001, 567 N.E.2d 739 (1991); 
Johnson v. National Supermarkets, Inc.
, 257 Ill. App. 3d 1011, 1015, 630 N.E.2d 934 (1994); 
Cohan v. Garretson
, 282 Ill. App. 3d 248, 256, 667 N.E.2d 1325 (1996); 
NWI International, Inc. v. Edgewood Bank
, 291 Ill. App. 3d 247, 261, 684 N.E.2d 401 (1997)), we nevertheless find that 
de
 
novo
 review is proper because the standard of review on appeal should be the same as that applied by the trial court, which, as 
City of Mattoon
 states: "fits the definition of 
de
 
novo
: '[a]new; afresh; a 
second
 
time
.'" (Emphasis in original).  
City of Mattoon
, 282 Ill. App. 3d at 633.  Although defendants argue that 
Mattoon
 is not controlling because it is a Fourth District case, our research has revealed First District case law in which the 
de
 
novo
 standard of review has been applied to directed verdicts.  
Green v. Jackson
, 289 Ill. App. 3d 1001, 682 N.E.2d 409 (1997); 
Dunlap v. Alcuin Montessori School
, 298 Ill. App. 3d 329, 698 N.E.2d 574 (1998); 
Los Amigos Supermarket, Inc. v. Metro Bank & Trust Co.
, 306 Ill. App. 3d 115, 713 N.E.2d 686 (1999).

A motion for directed verdict should be granted when "all of the evidence, when viewed in its aspect most favorable to the opponent, so overwhelmingly favors the movant that no contrary verdict based on the evidence could ever stand."  
Pedrick v. Peoria & Eastern R.R. Co.
, 37 Ill. 2d 494, 510, 229 N.E.2d 504, 513-14 (1967).  A directed verdict is improper where "there is any evidence, together with reasonable inferences to be drawn therefrom, demonstrating a substantial factual dispute, or where the assessment of credibility of the witnesses or the determination regarding conflicting evidence is decisive to the outcome."  
Maple v. Gustafson
, 151 Ill. 2d 445, 454, 603 N.E.2d 508 (1992).

Plaintiffs contend that sufficient evidence was presented to withstand a directed verdict as to Dr. Jundanian and Blue Island.  Plaintiffs first assert that Dr. Radfar's trial testimony provided the causal link between Dr. Jundanian's conduct and Taylor's cardiac arrest which ultimately led to the growth plate injury.  Defendants argue that the use of Dr. Radfar's testimony as expert witness testimony was improper because he was not disclosed as an expert witness and his opinions were only speculative.  In response, plaintiff maintains that Dr. Radfar was properly disclosed as an expert witness during his deposition.

Supreme Court Rule 213 requires mandatory disclosure of all opinion testimony, including that of a party to the litigation.  177 Ill. 2d R. 213;   
McMath v. Katholi
, 304 Ill. App. 3d 369, 377, 711 N.E.2d 1135 (1999).  A review of the record reveals that Dr. Radfar was properly disclosed as a witness. 

In a medical malpractice action, a plaintiff must prove: (1) the proper standard of care by which to measure the defendant's conduct; (2) a negligent breach of the standard of care; and (3) the resulting injury proximately caused by the defendant's lack of skill or care.  
Saxton v. Toole
, 240 Ill. App. 3d 204, 210, 608 N.E.2d 233 (1992).
  Proximate cause in a medical malpractice case must be established by expert testimony to a reasonable degree of medical certainty.  
Aguilera v. Mount Sinai Hospital Medical Center
, 293 Ill. App. 3d 967 (1997), citing 
First National Bank v. Porter
, 114 Ill. App. 3d 1, 13, 448 N.E.2d 256 (1983).  Questions concerning proximate cause are factual matters for the jury to decide.  
Espinoza v. Elgin, Joliet & Eastern Ry. Co.
, 165 Ill. 2d 107, 114, 649 N.E.2d 1323 (1995).  However, if the plaintiff fails to prove proximate cause, the plaintiff has not sustained the burden of making a 
prima
 
facie
 case and a directed verdict is proper.  
Wojtowicz v. Cervantes
, 284 Ill. App. 3d 524, 532, 672 N.E.2d 357 (1996). 

Defendants assert that plaintiffs failed to establish that Dr. Jundanian's failure to interpret Taylor's X ray's was the proximate cause of her injuries.  Plaintiffs argue that the evidence shows that had Dr. Jundanian properly interpreted Taylor's chest X ray, subsequent doctors would have had the opportunity to treat her condition and possibly avoid or minimize the injury to her growth plate. 

We hold that even viewing the evidence against Dr. Jundanian in the light most favorable to plaintiffs, the evidence of proximate cause was insufficient to submit to the jury.  A review of the record establishes that plaintiffs' expert witnesses only offered an opinion on the deviations from the standard of care, but no expert evidence was adduced to a reasonable degree of medical certainty that Dr. Jundanian's alleged deviations from the standard of care caused Taylor's injuries.  The mere possibility of a causal connection is not sufficient to sustain the burden of proof of proximate cause.  The causal connection must not be contingent, speculative or merely possible.  
Saxton
, 240 Ill. App. 3d at 210.  

The record demonstrates that plaintiffs failed to establish that Taylor's cardiac abnormalities would have been diagnosed if Dr. Jundanian had noted an enlarged heart on the X-ray report.  In addition to Dr. Jundanian, plaintiffs' expert witnesses also testified that the findings in Dr. Jundanian's report were abnormal.  They also testified that these findings, in conjunction with the other signs and symptoms available to Dr. Radfar, should have caused Dr. Radfar to diagnose Taylor's cardiac anomalies.  Plaintiffs' argument that Dr. Radfar would have acted differently if Dr. Jundanian's report had indicated that Taylor had an enlarged heart is speculative.  

Moreover, plaintiffs failed to show that Taylor's injuries were foreseeable.  Plaintiffs were unable to show that it was foreseeable that Taylor's cardiac arrest and the subsequent placement of the interosseous line would result in damage to the growth plate in her leg.  Indeed, Dr. Moran testified that growth plate arrest is not a known complication of the placement of an interosseous line.  Thus, the directed verdict granted in favor of Dr. Jundanian and Blue Island was proper.

Plaintiffs finally contend that the trial court erred in barring a portion of the testimony of Dr. Schwartz under Rule 213(g) (177 Ill. 2d R. 213(g)).  Plaintiffs assert that opinions disclosed in answers to interrogatories and depositions addressed almost the exact issues as those elicited during trial.  Defendants assert that Dr. Schwartz's opinions were never disclosed during discovery in violation of Supreme Court Rule 213.  

Illinois Supreme Court Rule 213 became effective January 1, 1996, and replaced Supreme Court Rule 220 (134 Ill. 2d R. 220).  Rule 213(g) explicitly states the following:

"An opinion witness is a person who will offer

any opinion testimony.  Upon written interrogatory, the party must state:

(i) the subject matter on which the

opinion witness is expected to testify;

(ii) the conclusions and opinions of

the opinion witness and the bases therefor; and

(iii) the qualifications of the

opinion witness;

and provide all reports of the opinion witness."  177 Ill. 2d 213(g).

Rule 213(i) provides:

"A party has a duty to seasonably supplement

or amend any prior answer or response whenever new or additional information subsequently becomes known to that party.

If a deposition of an opinion witness is

taken, the witness' testimony at trial will be limited to the opinion expressed therein, in addition to those opinions identified in answers to Rule 213(g) interrogatories.

The opinions expressed in a deposition need

not be later specifically identified in Rule 213(g) answers but, upon objection at trial, the burden is on the proponent of the witness to prove the opinions were provided in deposition or Rule 213(g) interrogatory."  177 Ill. 2d 213(i).

Rule 213 disclosure requirements are mandatory and subject to strict compliance.  
Seef v. Ingalls Memorial Hospital
, 311 Ill. App. 3d 7, 21, 724 N.E.2d 115 (1999).  Admission of evidence pursuant to Rule 213 is within the sound discretion of the trial court, and the court's ruling will not be disturbed absent an abuse of that discretion.  
Department of Transportation v. Crull
, 294 Ill. App. 3d 531, 537 (1998).  In 
Department of Transportation
, this court held:      

"Rule 213 establishes more exacting standards regarding disclosure than did Supreme Court Rule 220 ***, which formerly governed expert witnesses.  Trial courts should be more reluctant under Rule 213 than they were under former Rule 220 (1) to permit the parties to deviate from the strict disclosure requirements, or (2) not to impose severe sanctions when such deviations occur.  Indeed, we believe one of the reasons for new Rule 213 was the need to require stricter adherence to disclosure requirements."  
Department of Transportation
, 294 Ill. App. 3d at 538-39.

Given this stricter standard of compliance, the trial court did not abuse its discretion in sustaining the objection to the question asking Dr. Schwartz if it was his opinion that Dr. Radfar's deviations from the standard of care caused or contributed to Taylor's cardiac arrest.  On appeal, plaintiffs concede that "[i]t is true no one questioned Dr. Schwartz during the deposition with the 'magic' words as to whether or not the deviations from the standard of care by Dr. Lin caused or contributed to the cardiac arrest or injuries suffered by Taylor Susnis."  A review of the record reveals that the interrogatories also did not contain this opinion as to either Dr. Radfar or Dr. Lin.  It is also significant that prior to trial the court considered extensive motions 
in
 
limine
 and responses thereto.  The court barred plaintiffs' experts from testifying as to opinions not previously expressed in depositions or Rule 213 interrogatories.  This court has recently interpreted Supreme Court Rule 213 to require strict disclosure of this type of opinion testimony.  
Copeland v. Stebco Products Corp.
, No. 1-99-3940 (September 29, 2000).

Further, the record demonstrates that plaintiffs' counsel was allowed to elicit this testimony after rephrasing the questions.  Plaintiffs' counsel was specifically allowed to ask Dr. Schwartz if Dr. Radfar and Dr. Lin had met the standard of care, whether Taylor's cardiac arrest would have been avoided.  Under these circumstances, we hold that the trial court's decision to exclude this portion of Dr. Schwartz's testimony was not an abuse of discretion.

Finally, plaintiffs do not argue that the verdict for Dr. Lin was not supported by the evidence.  Even if the court had improperly barred Dr. Schwartz from answering the specific question at issue, any error was harmless.  See 
LoCoco v. XL Disposal Corp.
, 307 Ill. App. 3d 684, 691, 717 N.E.2d 823 (1999).    

Based on the foregoing reasons, the judgment of the circuit court of Cook County is affirmed.

Affirmed.

GREIMAN, J., and THEIS, J., concur.