Fifth Division
April 14, 2006

No. 1-03-2179

| | | |
|---|---|---|
| DEBRA GIANGIULIO, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County |
| | ) | |
| | ) | No. 00 M6 5977 |
| v. | ) | |
| | ) | |
| INGALLS MEMORIAL HOSPITAL, | ) | Honorable |
| | ) | Edward A. Antonietti, |
| Defendant-Appellant. | ) | Judge Presiding. |

JUSTICE NEVILLE delivered the opinion of the court:

This is an interlocutory appeal filed by the defendant, Ingalls Memorial Hospital (Ingalls),

pursuant to Supreme Court Rule 308 (155 Ill. 2d R. 308), from an order that granted the plaintiff's,

Debra Giangiulio, motion to compel discovery and required Ingalls to answer certain interrogatories

and to produce an object. Ingalls argues that the information and the object sought to be discovered

by the plaintiff were protected from disclosure by the physician-patient privilege (735 ILCS 5/8-802

(West 2002)), the Mental Health and Developmental Disabilities Confidentiality Act

(Confidentiality Act) (740 ILCS 110/1 *et seq.* (West 2002)), section 8-2102 of the Code of Civil

Procedure, commonly known as the Medical Studies Act (735 ILCS 5/8-2101, 8-2102 (West 2002))

and privacy rules and regulations created under the authority granted by the Health Insurance

Portability and Accountability Act of 1996 (HIPAA) (Pub. L. No. 104-191, 110 Stat. 1936; 45

C.F.R. §§160 through 164 (2005)). The trial court certified the following question for our review:

"[W]hether the Defendant Hospital is prohibited from responding to the Plaintiff's discovery requests pursuant to the Physician-Patient Privilege (735 ILCS 5/8-802), the Mental Health and Developmental Disabilities Confidentiality Act (740 ILCS 110/3), the Medical Studies Act (735 ILCS 5/8-2102) and the Privacy Rule set forth in Pub. L. 104-191, 45 C.F.R. Parts 160-164."[1]

The Appellate Court granted Ingalls' Rule 308 Petition for Leave to Appeal. 155 Ill. 2d R. 308.

## BACKGROUND

On July 11, 2001, Giangiulio filed her first amended complaint against Ingalls. The complaint alleged that the plaintiff was the victim of a criminal assault; that she was attacked by another patient during her stay at the hospital; and that Ingalls was negligent in preventing the attack by a third party. The alleged attacker was not named as a party defendant in Giangiulio's complaint.

Before filing her first amended complaint, on April 10, 2001, Giangiulio served Ingalls with

---

[1] The trial court's identification of "the privacy rule set forth in Pub. L. 104-191, 45 C.F.R. Part, 160-164" is a reference to HIPAA and the rules and regulations created thereunder. 42 U.S.C. §1320d *et seq.* (2000); 45 C.F.R. §§160 through 164 (2005).

22 interrogatories and with a demand for production of nine documents, objects or tangible things. In its answers to the interrogatories, Ingalls objected to interrogatories 2, 3, 5, 7, 8 and 10 as follows:

"2. State the full name, address, and telephone number of the 'JANE DOE' alleged in Plaintiff's Complaint.

ANSWER: Objection. INGALLS HOSPITAL will not be producing any documents, records, information or tangible objects relating to 'JANE DOE.' See Exhibit 'A' attached hereto for the basis for the refusal to provide these records.

3. State the full name, address, and telephone number of all doctors, physicians, nurses, and any other staff who were treating the 'JANE DOE' alleged in Plaintiff's Complaint.

ANSWER: See answer to Interrogatory #2 above.

\*\*\*

5. State the full name, address, and telephone number of the Defendant's employee or staff member who assigned the 'JANE DOE' to Room 417E.

ANSWER: See answer to Interrogatory #2 above.

\*\*\*

7. State the full name, address, and telephone number of all staff members who took and retrieved the knife from the 'JANE DOE' alleged in Plaintiff's Complaint.

ANSWER:  See answer to Interrogatory #2 above.

8. State the full name, address, and telephone number of the patient assigned to Room 417E, bed number 2 on the date of the accident alleged in the Complaint.

ANSWER:  See answer to Interrogatory #2 above.

\*\*\*

10.  State the period of time which "JANE DOE" alleged in Plaintiff's Complaint was a patient at Defendant's facility immediately preceding the date of the accident.

ANSWER:  See answer to Interrogatory #2 above."

As indicated in its answer, Ingalls attached Exhibit "A" to its response to the interrogatories and demand for production.  Exhibit "A" was a letter addressed to plaintiff's counsel (John Brattoli) in which  Ingalls' counsel explained the bases for the hospital's refusal to answer.  Ingalls' refusal to disclose the information was based on the following: the attorney-client and work product privileges in Supreme Court Rule 201(b)(2) (166 Ill. 2d R. 201(b)(2)); the physician-patient privilege in section 8-802 of the Code of Civil Procedure (735 ILCS 5/8-802 (West 2002)); sections 8-2101 and 8-2102 of the Medical Studies Act (735 ILCS 5/8-2101,  8-2102 (West 2002)); and the Mental Health and Developmental Confidentiality Act (740 ILCS 110/1 *et seq.*)

In her request for production entitled "demand for production," Giangiulio requested certain documents, objects or tangible things.  In request "f ", Giangiulio sought production of the knife that Jane Doe allegedly had in her possession which was later taken from her by Ingalls' staff members.

Ingalls objected to request "f " as follows:

> "f.    The knife which the 'JANE DOE' alleged in Plaintiff's Complaint has in her possession and which was later taken from her by Defendant's staff members.
>
> RESPONSE:  See response to (e) above."

In (e), Ingalls made the following response:

> "RESPONSE:  Objection.  INGALLS HOSPITAL will not be producing any documents, records, information or tangible objects relating to 'JANE DOE.'  See Exhibit 'A' for the basis for the refusal to provide these documents."

It should be noted that in support of the objections to the requests to produce, Ingalls attached a copy of the same letter to plaintiff's counsel that it used in its answers to the interrogatories.  In the letter, Ingalls identifies the same bases for its objections.

Thereafter, Giangiulio filed a motion to compel responses to written discovery. Giangiulio argued that interrogatories 2, 3, 5, 7, 8 and 10 are permitted by case law and not barred by privilege.  Giangiulio further argued that Ingalls should be ordered to respond to paragraph "f " of her demand for production, wherein she requested the knife.  Giangiulio argued that the knife had nothing to do with the medical or psychiatric ailment for which Jane Doe was being treated, so the production of the knife would not violate the Confidentiality Act.

Ingalls responded to the motion by reiterating its position that the information sought in interrogatories 2, 3, 5, 7, 8, and 10 is protected by the physician-patient privilege.  735 ILCS 5/8-802

(West 2002). Ingalls also responded that the Confidentiality Act prevents it from revealing the information requested in interrogatories 2, 3, 5, 7, 8, and 10. 740 ILCS 110/1 *et seq.* (West 2002). Ingalls further argued that the knife sought in request to produce "f " has no bearing on the ultimate question of the hospital's liability in this case. Also, information regarding the knife would be protected by either the physician-patient privilege, the Confidentiality Act and/or the Medical Studies Act. Ingalls made the same argument with respect to requests to produce "e" and "h". Request "e" sought medical bills, records, notes, reports, statements, doctors' notes, nurses' notes, radiological reports, and any other documents regarding Jane Doe's care and treatment. Request "h" sought receipts, notes, records, reports, incident reports, investigation reports, accident reports, files, documents and bills related to the attack. We note that Ingalls objected to requests for production "e", "f " and "h" based upon the privileges delineated in its Exhibit "A." However, we also note that Giangiulio's motion to compel only requested that the trial court order the production of the knife which was requested in request "f ", but did not seek to compel production of the document in requests "e" and "h".

In a supplemental response to Giangiulio's motion to compel, Ingalls objected on the basis of HIPAA. Pub. L. No. 104-191, 110 Stat. 1936; 45 C.F.R. §§160 through164 (2005).

On July 18, 2003, the trial court entered an order that granted Giangiulio's motion to compel responses to her interrogatories and compelled production of the object requested in demand "f." The trial court also found, pursuant to Rule 308, that there was a question of law as to which there is substantial ground for difference of opinion and that an immediate appeal may materially advance the ultimate termination of the litigation. Ingalls' petition for leave to appeal was granted by the

appellate court.

ANALYSIS

Giangiulio initially argues that Ingalls should be deemed to have waived any objection to the interrogatories and demands for production that were sent to Ingalls on April 10, 2001. According to Supreme Court Rule 213(d), the discovery was to be answered within 28 days. 177 Ill. 2d R. 213(d). Ingalls' response was not received until January 13, 2003. As a result, Giangiulio argues Ingalls' objections should be deemed waived for failure to file those objections within 28 days.

Giangiulio also argues that, because Ingalls made no argument in its opening brief with respect to interrogatories 4, 6, 14, 15 and 16, the trial court's ruling on those should be affirmed. Giangiulio insists that it is for the court, not the defendant, to determine whether the privilege actually attaches. Giangiulio argues that, pursuant to Supreme Court Rule 341(e)(7) (Official Reports Advance Sheet No. 21 (October 17, 2001), R. 341(e)(7), eff. October 1, 2001), points not argued are waived.

Ingalls responds that questions concerning the timeliness of its responses to the discovery requests are beyond the scope of the certified question forming the sole basis of this appeal. Ingalls argues that none of its objections should be deemed waived because it made a broad attack based on various different statutory provisions.

Our examination of an interlocutory appeal brought pursuant to Rule 308 is strictly limited to the certified question presented to the court. Fosse v. Pensabene, 362 Ill. App. 3d 172, 177 (2005), quoting Thompson v. Gordon, 356 Ill. App. 3d 447, 451 (2005), appeal allowed, 216 Ill. 2d 736 (2005). We conduct a *de novo* review of all questions of law. Fosse, 362 Ill. App. 3d at 177. With

rare exceptions, we do not expand the question under review to answer other, unasked questions. Fosse, 362 Ill. App. 3d at 177, citing Dearing v. Baumgardner, 358 Ill. App. 3d 540, 542 (2005), citing Jones v. City of Carbondale, 217 Ill. App. 3d 85, 88 (1991). "Our task is to answer the certified questions rather than to rule on the propriety of any underlying order." Fosse, 362 Ill. App. 3d at 177, citing P.J.'s Concrete Pumping Service, Inc. v. Nextel West Corp., 345 Ill. App. 3d 992, 998 (2004). We note that in interrogatories 2, 3, 5, 7, 8, and 10 and in request to produce "f " Ingalls invoked the privileges delineated in Exhibit "A." Therefore, we will only answer the certified question presented to the appellate court as it relates to interrogatories 2, 3, 5, 7, 8, and 10 and request for production "f " where Ingalls invoked one of the aforementioned privileges.

Physician-Patient Privilege

Ingalls argues that the trial court erred in compelling responses to the written discovery because the information is protected by various statutes and regulations. According to Ingalls, the information is protected because Jane Doe, whose medical records are sought, has never been made a party to the litigation. Because she is a patient and a nonparty to the litigation, Ingalls argues that Jane Doe's situation falls squarely within the intended protection of the physician-patient privilege. 735 ILCS 5/8-802 (West 2000). Ingalls also argues that it would be insufficient to attempt to protect Jane Doe's confidentiality simply by deleting her name from the records because the cumulative impact of information in a patient's medical records can make the possibility of recognition very high. According to Ingalls, it does not matter that the information contained in the records is extremely relevant because it is outweighed by the need for protection.

Giangiulio argues that the information sought in interrogatories 2, 3, 5, 7, 8, and 10, as well

as the knife sought in the request for production, are not protected by the physician-patient privilege. Giangiulio argues that the disclosure of a patient's name does not violate a physician-patient privilege. Similarly, Giangiulio argues that learning the identity of and deposing the doctors and staff involved in Jane Doe's treatment, the person who assigned Jane Doe to Giangiulio's room and the person who retrieved the knife from Jane Doe does not automatically amount to the revelation of privileged, protected information. According to Giangiulio, Ingalls' arguments are based upon the idea that the information sought was medical treatment information, medical records, discharge summaries and other types of factual data. The interrogatories at issue are seeking the identity of people, not anything relating to Jane Doe's medical records or treatment. Finally, Giangiulio argues that the knife has nothing to do with the treatment received by Jane Doe or the medical or psychiatric conditions for which she was being treated at the time of the incident.

Ingalls replies that Giangiulio's response exceeds the parameters of the certified question. Additionally, because the certified question does not limit this court's inquiry to certain of the interrogatories, Ingalls argues this court's review is generally directed to whether the information sought in discovery is protected by privilege.

The physician-patient privilege is codified in section 8-802 of the Code of Civil Procedure. Tomczak v. Ingalls Memorial Hospital, 359 Ill. App. 3d 448, 452 (2005). The privilege is designed to help patients feel comfortable when making disclosures to their physicians and to protect their privacy from invasion. Tomczak, 359 Ill. App. 3d at 452, citing Reagan v. Searcy, 323 Ill. App. 3d 393, 395 (2001). Section 8-802 provides that "[n]o physician or surgeon shall be permitted to disclose any information he or she may have acquired in attending any patient in a professional

character, necessary to enable him or her professionally to serve the patient." Tomczak, 359 Ill. App. 3d at 452, quoting 735 ILCS 5/8-802 (West 2002). Section 8-802 specifically enumerates exceptions to the privilege. Tomczak, 359 Ill. App. 3d at 452, citing 735 ILCS 5/8-802 (West 2002). These exceptions are as follows: (1) homicide trials when the disclosure relates directly to the homicide; (2) civil or criminal malpractice actions against the physician; (3) when the patient expressly consents or, in case of his or her death or disability, a lawsuit is filed by a personal representative, beneficiary of an insurance policy, or another person authorized to sue for personal injury on the patient's life, health, or physical condition; (4) actions wherein the patient's physical or mental condition is an issue, whether the action is brought by or against the patient, a personal representative, beneficiary under a policy of insurance, or the executor or administrator of the patient's estate; (5) an action wherein the issue regards the validity of a document purporting to be the patient's will; (6) a criminal action with a charge of abortion, attempted abortion, or first degree murder by abortion; (7) civil or criminal actions arising from the filing of a report in compliance with the Abused and Neglected Child Reporting Act (325 ILCS 5/1 *et seq.* (West 2002)); (8) to any department, agency, institution or facility which has custody of the patient pursuant to State statute or any court order of commitment; (9) prosecutions where written results of blood-alcohol tests are admissible pursuant to section 11-501.4 of the Illinois Vehicle Code (625 ILCS 5/11-501.4 (West 2002)); (10) prosecutions where written results of blood-alcohol tests are admissible under section 5-11a of the Boat Registration and Safety Act. (625 ILCS 45/5-11a (West 2002) (renumbered as (625 ILCS 45/5-16a (West 2002)); and (11) suspected terrorist offenses when the criminal action arises from the filing of a report of suspected terrorist offense in compliance with section

29D-10(p)(7) of the Criminal Code of 1961 (720 ILCS 5/29D-10 (West 2002)). 735 ILCS 5/8-802 (West 2002). After examining the aforementioned exceptions to the privilege, we find that none of the exceptions are applicable to the case at bar.

According to Tomczak, the physician-patient privilege protects the medical records of nonparties. Tomczak, 359 Ill. App. 3d at 452, citing In re D.H., 319 Ill. App. 3d 771, 776 (2001) and Parkson v. Central Du Page Hospital, 105 Ill. App. 3d 850, 855 (1982). Similar protection exists for the medical records of nonparties when that information is to be used by the physician treating the nonparty, but the information has been gathered by a nurse. Tomczak, 359 Ill. App. 3d at 452, citing House v. SwedishAmerican Hospital, 206 Ill. App. 3d 437, 446 (1990), and Ekstrom v. Temple, 197 Ill. App. 3d 120, 124 (1990). According to House and Ekstrom, the physician-patient privilege prevents the disclosure of the medical records of nonparty patients, even though disclosure would not be barred by the physician-patient privilege if the nonparty patient had been a party. House, 206 Ill. App. 3d at 444, citing Ekstrom, 197 Ill. App. 3d at 130, and Parkson, 105 Ill. App. 3d at 854-55. We note, however, that the physician-patient privilege protection applicable to the medical records of nonparty patients is not absolute. Tomczak, 359 Ill. App. 3d at 453, citing House, 206 Ill. App. 3d at 445. Tomczak explains that, in applying the physician-patient privilege, the Ekstrom court should have distinguished between the types of information sought. Tomczak, 359 Ill. App. 3d at 453, citing Ekstrom, 197 Ill. App. 3d at 130. Following Tomczak, we believe that the applicability of a privilege depends on whether the nonparty patient information sought by Giangiulio is general information or is treatment information that is necessary to enable a physician

to serve a patient. Tomczak, 359 Ill. App. 3d at 453, citing Geisberger v. Willuhn, 72 Ill. App. 3d 435, 437 (1979). Geisberger holds that information such as the name and address of a patient alone, is not protected by the statutory privilege because that information is not a necessary part of a physician's duty to treat, prescribe or act for the patient. Geisberger, 72 Ill. App. 3d at 437. In order to establish the physician-patient privilege, the party seeking to assert it must show facts giving rise to the privilege. Tomczak, 359 Ill. App. 3d at 454, citing Cox v. Yellow Cab Co., 61 Ill. 2d 416, 419-20, quoting Krupp v. Chicago Transit Authority, 8 Ill. 2d 37, 42 (1956). Therefore, we must examine interrogatories 2, 3, 5, 7, 8, and 10 and request "f " to determine the nature of the information or objects Giangiulio sought in her discovery and whether the information is required for the physician to be able to properly treat the patient.

In interrogatories 2, 3, 5,7 ,8, and 10, Giangiulio primarily sought identification information. She requested the name, address and telephone number of Jane Doe, of hospital staff members who treated her, and of any employee or staff member who was assigned to Jane Doe's hospital room. In request "f, " she sought the knife used in the assault. According to House, "[s]imply revealing the patient's identity, in and of itself, will not result in the disclosure of confidential communications." House, 206 Ill. App. 3d at 445, citing Davis v. Hinde, 141 Ill. App. 3d 664, 666 (1986), and Geisberger, 72 Ill. App. 3d at 438. Because Giangiulio was stabbed, she sought identification information about the staff members who retrieved the knife. She also requested the knife itself pursuant to her demand for production. Finally, Giangiulio sought information on how long Jane Doe was a patient at the hospital before the attack.

Where Giangiulio sought the identity of the doctors and other employees and staff members

who had contact with Jane Doe, she did not ask for Jane Doe's medical or psychiatric records. Similarly, asking for the names and other information about the employees who retrieved the knife allegedly used by Jane Doe during the assault or the name of the person who shared a hospital room does not automatically involve the release of Jane Doe's medical records or the treatment information contained therein. We note that Ingalls did not present any facts which established that Jane Doe's name, address and telephone number were necessary to enable her physician to care for or treat her. We find no nexus between the information sought and the care or treatment that Jane Doe received or the medical or mental condition from which she suffered. We simply do not believe that the information sought by Giangiulio in interrogatories 2, 3, 5, 7 and 8 would reveal details about Jane Doe's medical or mental condition or her diagnosis and treatment that would compromise her privacy rights.

In addition, in interrogatory 10 Giangiulio requests "time data" or non-medical factual information about the length of Jane Doe's stay in the hospital. The "time data" requested in interrogatory 10 is not related to Jane Doe's diagnosis or treatment. There is no nexus between the "time data" sought and the care or treatment Jane Doe received at Ingalls. Therefore, the "time data" falls outside the scope of the physician-patient privilege. See Tomczak, 359 Ill. App. 3d at 452-54.

Ingalls also invoked the physician-patient privilege with regards to the knife. We note that the physician-patient privilege prohibits the disclosure of information but does not prohibit the disclosure of objects that are not related to the patient's medical care. 735 ILCS 5/8-802 (West 2000). We also find that request "f, " requiring production of the knife, does not involve the release of information regarding Jane Doe's medical or mental condition, diagnosis or treatment.

Accordingly, we hold that the information Giangiulio sought in interrogatories 2, 3, 5, 7, 8, and 10 and the knife sought in request for production "f " are not protected by the physician-patient privilege. 735 ILCS 5/8-802 (West 2000).

## Medical Studies Act

Next, Ingalls argues that the information sought is protected under sections 8-2101 and 8-2102 of the Medical Studies Act. 735 ILCS 5/8-2101, 8-2102 (West 2002). Ingalls argues that such information is defined and, with notable exception, placed within the scope of a privilege in section 8-2101. Section 8-2102 of the Medical Studies Act provides that privileged information shall not be admissible as evidence or discoverable in proceedings before courts, tribunals, boards, agencies or people. 735 ILCS 5/8-2102 (West 2002). According to Ingalls, the hospital's customary practice is to include a written reference to the Medical Studies Act, which contains a disclosure privilege, on every confidential report it generates that would be relevant to this case.

Giangiulio argues that the Medical Studies Act does not apply to this situation because that Act deals with privileged materials in peer review situations. According to Giangiulio, the Medical Studies Act is premised on the desire to encourage physicians to participate in frank professional evaluations and peer review. Because there is no medical malpractice in the case at bar, Giangiulio argues there is no peer-review-oriented reason to invoke the Medical Studies Act to prevent disclosure of the information requested in interrogatories 2, 3, 5, 7, and 8. Additionally, Giangiulio argues the Medical Studies Act does not apply to interrogatory 10 because it seeks no medical or psychiatric records.

Section 8-2101 of the Medical Studies Act provides, in pertinent part, as follows:

"All information \*\*\* <u>used in the course of internal quality control or of medical study for the purpose of reducing morbidity or mortality, or for improving patient care or increasing organ and tissue donation, shall be privileged, strictly confidential and shall be used only for medical research</u>, increasing organ and tissue donation, the evaluation and improvement of quality care, or granting, limiting or revoking staff privileges or agreements for services, except that in any health maintenance organization proceeding to decide upon a physician's services or any hospital or ambulatory surgical treatment center proceeding to decide upon a physician's staff privileges, or in any judicial review of either, the claim of confidentiality shall not be invoked to deny such physician access to or use of data upon which such a decision was based."(Emphasis added.)  735 ILCS 5/8-2101 (West 2002).

The purpose of the Medical Studies Act is to ensure that members of the medical profession can maintain effective professional self-evaluation and to improve the quality of healthcare. <u>Pietro v. Marriott Senior Living Services, Inc.</u>, 348 Ill. App. 3d 541, 548 (2004), citing <u>Roach v. Springfield Clinic</u>, 157 Ill. 2d 29, 40 (1993); <u>Stricklin v. Becan</u>, 293 Ill. App. 3d 886, 890 (1997). The belief underlying the Medical Studies Act is that, without a statutorily mandated peer-review privilege, it is unlikely that physicians would evaluate their colleagues. <u>Pietro</u>, 348 Ill. App. 3d at 548, citing <u>Roach</u>, 157 Ill. 2d at 40; <u>Stricklin</u>, 293 Ill. App. 3d at 890, citing <u>Jenkins v. Wu</u>, 102 Ill.

2d 468, 480 (1984). However, Stricklin noted that the supreme court has also held that not every piece of information a hospital staff acquires is nondiscoverable, even if it is acquired by a peer-review committee. Stricklin, 293 Ill. App. 3d at 890, citing Roach, 157 Ill. 2d 29. "[T]he Act protects against disclosure of the mechanisms of the peer-review process, including information gathering and deliberations leading to the ultimate decision rendered by a peer-review committee, but does not protect against the discovery of information generated before the peer-review process begins or information generated after the peer-review process ends." Pietro, 348 Ill. App. 3d at 549, citing Webb v. Mount Sinai Hospital & Medical Center of Chicago, Inc., 347 Ill. App. 3d 817, 825 (2004).

It is a generally accepted rule of statutory construction that a statute should be read so that no term is rendered superfluous or meaningless. Doe v. Illinois Masonic Medical Center, 297 Ill. App. 3d 240, 243 (1998), citing Niven v. Siqueira, 109 Ill. 2d 357, 365 (1985). The information sought in the interrogatories has nothing to do with peer review. We are not persuaded by the fact that Ingalls routinely references the Medical Studies Act when it produces documents. "A party's 'mere assertion that the matter is confidential and privileged will not suffice.' " Menoski v. Shih, 242 Ill. App. 3d 117, 121 (1993), quoting Ekstrom v. Temple, 197 Ill. App. 3d 120, 127 (1990). "The applicability of a discovery privilege is a matter of law for the court to determine, but the question of whether specific materials are part of a medical study is a factual question within that legal determination." Menoski, 242 Ill. App. 3d at 121, citing Niven, 109 Ill. 2d at 368, and Willing v. St. Joseph Hospital, 176 Ill. App. 3d 737, 744 (1988). We are unwilling to permit Ingalls to make Jane Doe's information privileged under the narrow scope of the Medical Studies Act by merely placing a

disclaimer on a document that is not used in connection with a program or study designed to improve internal quality control, patient care or reduce morbidity or mortality. Zajac v. St. Mary of Nazareth Hospital Center, 212 Ill. App. 3d 779, 788 (1991). We find that the information requested in interrogatories 2, 3, 5, 7, 8, and 10 is not quality assurance information involving patient care. 735 ILCS 5/8-2101 (West 2002); also see Pietro, 348 Ill. App. 3d at 548. Because the Medical Studies Act is focused on information, records, reports, statements, notes, memoranda, or other data, it has no applicability to the knife sought in request to produce "f." 735 ILCS 5/8-2101, 8-2202 (West 2002). Therefore, we hold that the Medical Studies Act does not provide Ingalls with a shield for the information requested in interrogatories 2, 3, 5, 7, 8 and 10 or the knife requested in request "f." 735 ILCS 5/8-2101, 8-2102 (West 2002).

Mental Health and Developmental Disabilities Confidentiality Act

Next, Ingalls argues that the information sought in interrogatories 2, 3, 5, 7, 8 and 10 and the object sought in request "f " is protected from disclosure by section 3(a) of the Confidentiality Act. 740 ILCS 110/3(a) (West 2002). Ingalls argues that section 3(a) provides a broader protection from disclosure for all records and communications. According to Ingalls, it does not matter that the information sought is extremely relevant.

Giangiulio argues that, as with the physician-patient privilege, the Confidentiality Act deals with medical information, medical records, discharge summaries and factual data contained in medical records. Because the information sought has nothing to do with Jane Doe's treatment or her underlying medical or mental condition, Giangiulio argues no privilege should attach.

"The Mental Health and Developmental Disabilities Confidentiality Act provides that 'any

record kept by a therapist or by an agency in the course of providing mental health or developmental disabilities service to a recipient' and 'any communication made by a recipient or other person to a therapist or to or in the presence of other persons during or in connection with providing mental health or developmental disability services to a recipient,' including 'information which indicates that a person is a recipient,' 'shall be confidential and shall not be disclosed except as provided in this Act.' " Norskog v. Pfiel, 197 Ill. 2d 60, 71 (2001), quoting 740 ILCS 110/2, 3(a) (West 2000). The remainder of the Confidentiality Act identifies who may inspect and copy a recipient's mental health record, and when and how it is to be accomplished. Norskog, 197 Ill. 2d at 71. " 'The Confidentiality Act is carefully drawn to maintain the confidentiality of mental health records except in the specific circumstances explicitly enumerated.' " Norskog, 197 Ill. 2d at 71, quoting Sassali v. Rockford Memorial Hospital, 296 Ill. App. 3d 80, 84-85 (1998). Where permitted, the Act has been carefully drafted with narrowly crafted exceptions by the legislature to limit any disclosures to accomplish a particular purpose. Norskog, 197 Ill. 2d at 71, citing Pritchard v. SwedishAmerican Hospital, 191 Ill. App. 3d 388, 402 (1989). According to the supreme court, "[w]hen viewed as a whole, the Act constitutes a 'strong statement' by the General Assembly about the importance of keeping mental health records confidential." Norskog, 197 Ill. 2d at 71-72, quoting Mandziara v. Canulli, 299 Ill. App. 3d 593, 599 (1998). Therefore, "[a]nyone seeking the nonconsensual release of mental health information faces a formidable challenge and must show that disclosure is authorized by the Act." Chand v. Patla, 342 Ill. App. 3d 655, 662 (2003), quoting Norskog, 197 Ill. 2d at 72.

According to the United States Supreme Court, "[e]ffective psychotherapy *** depends upon

an atmosphere of confidence and trust in which the patient is willing to make a frank and complete disclosure of facts, emotions, memories, and fears.  Because of the sensitive nature of the problems for which individuals consult psychotherapists, disclosure of confidential communications made during counseling sessions may cause embarrassment or disgrace.   For this reason, the mere possibility of disclosure may impede development of the confidential relationship necessary for successful treatment."  Norskog, 197 Ill. 2d at 72, quoting Jaffee v. Redmond, 518 U.S. 1, 10, 135 L. Ed. 2d 337, 345, 116 S. Ct. 1923, 1928 (1996).

Unlike Norskog, where the Illinois Supreme Court found that records and communications concerning mental health treatment that a patient received are subject to the privilege in the Mental Health Act (Norskog, 197 Ill. 2d at 73), Giangiulio argues that she is not seeking information  that is related to the mental illness or infirmity suffered by her attacker.  Instead, Giangiulio argues that her discovery was directed at learning how long her attacker was a patient and which staff members and hospital employees had contact with her.  In addition, Giangiulio also seeks production of the knife.

The Confidentiality Act defines both communication and confidential communication as being "any communication made by a recipient or other person to a therapist or to or in the presence of other persons during or in connection with providing mental health or developmental disability services to a recipient.  Communication includes information which indicates that a person is a recipient."  740 ILCS 110/2 (West 2002).  Mental health or developmental disabilities services "includes but is not limited to examination, diagnosis, evaluation, treatment, training, pharmaceuticals, aftercare, habilitation or rehabilitation."  740 ILCS 110/2 (West 2002).  The Confidentiality Act also defines a record as information "kept by a therapist or by an agency in the

course of providing mental health or developmental disabilities service to a recipient concerning the recipient and the services provided."  740 ILCS 110/2 (West 2002).

The Confidentiality Act prohibits the release of information that would tend to identify Jane Doe as a recipient of mental health services. 740 ILCS 110/3 (West 2002). There is a document in the record that alleges that Jane Doe was being treated for mental illness. The first amended complaint alleges that, "prior to the date and time" of the attack, Jane Doe "had exhibited dangerous propensities both toward [Giangiulio] and other persons."  The complaint also alleges that Jane Doe "suffered from various mental and emotional illnesses thereby making her a danger to the health and well-being of other patients."  The aforementioned allegations in the complaint identify Jane Doe as a possible recipient of mental health services. Given the allegations in the complaint, interrogatories 2 and 10 violate both the letter and spirit of the Confidentiality Act.  Interrogatory number 2 asks for Jane Doe's name, address and telephone number.   Similarly, because interrogatory number 10 asks for the period of time Jane Doe was a patient at Ingalls before the attack, it is a request for information found in her hospital records which is privileged if she is a mental patient, so it violates the Confidentiality Act. 740 ILCS 110/1 *et seq.* (West 2002).  Conversely, it is not necessary to identify Jane Doe in order to answer interrogatories 3, 5, and 7.  In those interrogatories, Giangiulio seeks information regarding the doctors, nurses, staff and employees with whom Jane Doe had contact. Because Giangiulio is suing the hospital, its employees and staff for their negligence in allowing her to be attacked while a patient, no information about Jane Doe's medical or mental condition is required when answering those interrogatories.  While continuing to designate her as

Jane Doe, Ingalls is required to answer interrogatories 3, 5, and 7. The remaining interrogatory, number 8, asks for information concerning another patient in bed 2 in hospital room 417E. In the event the patient in bed 2 in room 417E is suffering from a "medical condition," her name, address, and telephone number are discoverable; however if the patient is suffering from a "mental illness" or "psychological condition" that would come within the purview of the privilege in the Confidentiality Act, the Act bars the release of that patient's name, address and telephone number. 740 ILCS 110/3 (West 2002). Because request to produce "f " does not seek mental health information (740 ILCS 110/2 (West 2002)) but, instead, seeks the knife, the Confidentiality Act is not applicable. 740 ILCS 110/3 (West 2002). Finally, we note that the Confidentiality Act will not apply if Jane Doe's name, address or telephone number are discovered through inadvertence or from some source other than her hospital records. House, 206 Ill. App. 3d at 442-45.

Health Insurance Portability and Accountability Act

Next, Ingalls argues that the information sought is protected under parts 160 and 164 of Title 45 of the Code of Federal Regulations. 45 C.F.R. §§160 through 164 (2005). These are United States Department of Health and Human Services rules designed to protect patients' medical records. Ingalls argues that the HIPAA rules encompass individually identifiable health information including underlying data related to a patient's physical and/or mental health which identifies that individual. This includes common identifiers such as name, address, birth date, and social security number. However, according to Ingalls, the federal HIPAA privacy rules are not limited to financial transactions related to health care claims. Ingalls argues that, because it is a health care provider that transmits health information in an electronic form, it would be considered a covered entity under the

HIPAA privacy rules. Without express written consent from the patient, Ingalls argues that it would be prohibited from disclosing any of the protected health information. According to Ingalls, Giangiulio never obtained approval from Jane Doe for the release of her private medical records.

Giangiulio argues that the information sought is not protected from disclosure by the federal HIPAA privacy rule. According to Giangiulio, HIPAA protects electronic transmissions from disclosure which concern health care claims, benefits, plans, enrollment, eligibility, premiums, the payment of premiums, referrals and reports of injury. Giangiulio argues that the underlying interrogatories do not request financial information that is related to health care claims protected by the United States Department of Health and Human Services.

HIPAA is a federal Act "intended to provide a baseline of health information privacy protections, which states are free to rise above in order to best protect their citizens." D. Wirtes, Jr., R. Lamberth, & J. Gomez, An Important Consequence of HIPAA: No More Ex Parte Communications Between Defense Attorneys and Plaintiff's Treating Physicians, 27 Am. J. Trial Advoc. 1, 4 (2003) (Important Consequence of HIPAA). Pursuant to HIPAA, the United States Department of Health and Human Services (HHS) adopted privacy rules to regulate protected health information and when that information could be disclosed. 42 U.S.C. §1320d(6) (2000); also see Moss v. Amira, 356 Ill. App. 3d 701, 710-12 (2005) (Quinn, J., specially concurring), citing 45 C.F.R. §§160, 164 (2004). Under the HIPAA, protected health information may not be disclosed without valid authorization and use or disclosure must be made in a manner consistent with the authorization granted. Moss, 356 Ill. App. 3d at 711 (Quinn, J., specially concurring), quoting

Important Consequence of HIPAA, 27 Am. J. Trial Advoc., at 5-6, citing 45 C.F.R. §164.512(e)(1).

HIPAA contains a preemption provision that generally supercedes contrary state law provisions. 42 U.S.C. §1320d-7(a)(1) (2000). The intended purpose of section 1320d-7(a)(1) of Title 42 of the United States Code has been implemented by section 160.203 of the Code of Federal Regulation. 45 C.F.R. §160.203 (2005). However, HIPAA does not preempt state laws that are more stringent. 45 C.F.R. §160.203(b) (2005); also see Important Consequence of HIPAA, 27 Am. J. Trial Advoc., at 4. According to HIPAA, the term "more stringent" means, when compared with a particular state's law, HIPAA must permit disclosure in circumstances where the state law does not. 45 C.F.R. §160.202 (2005). HIPAA also contains regulations for judicial proceedings that permit disclosure under certain conditions. 45 C.F.R. §§164.512(e)(1)(I), (e)(1)(ii)(2005); Important Consequence of HIPAA, 27 Am. J. Trial Advoc. at 5-6. Those conditions include, but are not limited to, permitting disclosures pursuant to an order of a court, or "[i]n response to a subpoena, discovery request, or other lawful process that is not accompanied by an order of a court or administrative tribunal." (Emphasis added.) 45 C.F.R. §§164.512(e)(1)(i), (e)(1)(ii)(2005); Important Consequence of HIPAA, 27 Am. J. Trial Advoc., at 5-6; also see Moss, 356 Ill. App. 3d at 711 (Quinn, J., specially concurring). In those instances where a reasonable discovery request has been made, the trial court must make certain that the covered entity receives satisfactory assurances. 45 C.F.R. §164.512 (e)(1)(iii)(2005). The required assurances are that the party requesting the information has made a good-faith attempt to provide written notice to the individual (45 C.F.R. §164.512 (e)(1)(iii)(A)(2005)), that the notice included sufficient information about the litigation or proceeding in which the protected health information is requested to permit the individual to raise an

objection to the court or administrative tribunal (45 C.F.R. §164.512 (e)(1)(iii)(B)(2005)), and the time for the individual to raise objections to the court or administrative tribunal has elapsed (45 C.F.R. §164.512 (e)(1)(iii)(C)(2005)) and either no objections were filed (45 C.F.R. §164.512(e)(1)(iii)(C)(1)(2005)) or all raised objections were resolved by the court and the requested release of information is consistent with the court's resolution. (45 C.F.R. §164.512(e)(1)(iii)(C)(2)(2005)).

Where the information sought by a party to litigation involves a nonparty, HIPAA does not preempt Illinois law. Moss, 356 Ill. App. 3d at 712 (Quinn, J., specially concurring), quoting National Abortion Federation v. Ashcroft, No. 04 C 55 (N.D. Ill. February 6, 2004). According to Moss, the National Abortion Federation court held that " Illinois law concerning when nonparty patient medical records may be disclosed by hospitals or doctors is far more restrictive [than HIPAA]" Moss, 356 Ill. App. 3d at 712 (Quinn, J., specially concurring), quoting National Abortion Federation, slip op. at 7.

We find that Giangiulio's interrogatories and requests for production were made pursuant to Supreme Court Rules 213 and 214 (177 Ill. 2d R. 213; 166 Ill. 2d R. 214). Therefore, we hold that HIPAA does not act as a bar to disclosure of the information requested in interrogatories 2, 3, 5, 7, 8, and 10 or production of the knife in request "f."

CONCLUSION

In light of the foregoing, we answer the certified question as follows: (1) Ingalls is not prohibited by the physician-patient privilege from responding to interrogatories 2, 3, 5, 7, 8, and 10 and request for production "f "; (2) the Medical Studies Act does not bar disclosure of the

information requested in interrogatories 2, 3, 5, 7, 8 and 10 and request for production "f "; (3) the information requested in interrogatories 2 and 10 is protected from disclosure by the Confidentiality Act because disclosure of the information would tend to identify Jane Doe as a recipient of mental health services. However, the Confidentiality Act does not prohibit Ingalls from answering interrogatories 3, 5, and 7. As stated above, if the patient whose information is the subject of interrogatory 8 is suffering from a medical condition, the information is discoverable, but if the patient is suffering from a mental illness or psychological condition which would come within the purview of the privilege in the Confidentiality Act, Ingalls is not required to answer the interrogatory; and (4) HIPAA does not preempt Illinois law in this area and, therefore, does not bar disclosure of the information requested in interrogatories 2, 3, 5, 7, 8 and 10 and request for production "f."

Certified question answered.

GALLAGHER, P.J., and O'MARA FROSSARD, J., concur.